STATE of Iowa, Appellant,

v.

Daniel Lyle BROWN, Appellee.

No. 69060.

Supreme Court of Iowa.

Aug. 17, 1983.

Thomas J. Miller, Atty. Gen., and Lona Hansen, Asst. Atty. Gen., for appellant.

Michael M. Pedersen, Waterloo, for appellee.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, LARSON, and WOLLE, JJ.

LARSON, Justice.

Defendant Brown was charged with involuntary manslaughter under Iowa Code section 707.5(1) which provides punishment for one who "unintentionally causes the death of another person by the commission of a public offense ...," in this case OMVUI. The focus of this appeal is Brown's blood-alcohol test which supports the OMVUI charge. We affirm the district court's suppression of the test results.

On October 30, 1981, Brown was the driver of a car involved in an accident. One of his passengers died of injuries sustained. At the hospital, the investigating officer, knowing of the death, asked Brown to give a blood sample to determine alcohol content. Brown was not aware a death had occurred, but may have been told the passenger was seriously injured. The officer told Brown the test was a routine part of the investigation and that he was not charged with a crime. Although the officer detected a slight odor of alcohol on Brown, he did not think Brown was under the influence and did not think he had good cause to arrest him for OMVUI. Brown was not placed under arrest and, according to the officer, could have refused to take the test.

The officer told the medical technologist who drew the blood and ran the test that it was a "medical," not a "legal" blood sample. The part of the sample not used in the test was routinely destroyed by the hospital approximately a week later.

The officer testified that had the blood been a "legal" sample, a more rigorous procedure would have been followed to guarantee chain of custody and other evidentiary requirements.

At the pretrial conference, held in April 1982, the State moved to include in the minutes of testimony the name of an expert witness to testify to the significance of the results of the blood test relative to the OMVUI law. When the trial court granted the motion, Brown moved for the court to order the blood sample be made available for retesting by an expert of his choosing. This motion was not opposed by the State and was granted. Following the discovery that the sample had been destroyed, Brown moved to suppress the results of the test on due process grounds. The trial court granted the motion to suppress, and we granted the State's application for discretionary review.

At the suppression hearing, a doctor testified that the blood could have been accurately retested at the time set for trial. While describing the testing machine that was used as accurate and reliable, the doctor questioned the accuracy of the test results because he felt the tested blood alcohol level (.184%) was inconsistent with Brown's behavior as reported by the officer and hospital records. While the doctor testified that it is possible for an experienced drinker to cover up some of the signs of intoxication, he felt the test result was wrong to a reasonable degree of medical certainty in this instance. He testified that it is not possible to cover up such symptoms as slurred speech, blurry or bloodshot eyes, and lack of muscle coordination, none of which Brown exhibited that night.

■ In resolving the suppression issue, our starting point is *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), establishing the following three-part test for a due process violation resulting from state "suppression" of evidence:

1. a proper defense request for the evidence,

2. a showing that the evidence would be favorable to the defendant, and

3. a showing the evidence was material. Under *Brady,* good or bad faith on the part of the State is irrelevant.

It is within this due process framework that we will examine the State's specific challenges to the suppression of these test results. They are:

1. that there was no "suppression" by the police both because defendant's motion was untimely and because the sample was never within the State's control,

2. that while there is a duty to disclose exculpatory evidence, there is no obligation to disclose inculpatory evidence, and

3. that the blood sample was not material.

■ I. Under the first *Brady* test, the State claims there was no timely request for the sample. Iowa Rule of Criminal Procedure 10(4) requires filing of a motion to suppress within forty days of arraignment "unless the period of filing is extended by the court for good cause shown." While the motion was made outside the forty days, the trial court stated it had found good cause in the State's late addition of an expert to testify as to the blood sample and intoxication. This addition by the State, also untimely, changed the complexion of the State's case, prompting Brown to make a similar request. We see no persuasive reason to overrule the trial court's exercise of discretion under Iowa Rule of Criminal Procedure 10(4). We also note that, as the sample was destroyed about a week after it was taken, Brown's delay in requesting the sample resulted in no prejudice to the State.

Before reaching the specific question of whether the State "controlled" the sample, we must first ask whether the State has any obligation to acquire and preserve evidence which later may prove helpful to the defense. If the State had no obligation or control, there would be no "suppression." Many courts have found that the prosecution has such an affirmative duty. Failure to collect and preserve evidence, especially when it can be easily accomplished, has been ruled tantamount to suppression. *Garcia v. District Court, Twenty-First Judicial District,* 197 Colo. 38, 46–47, 589 P.2d 924, 929–30 (1979); *Lauderdale v. State,* 548 P.2d 376, 382 (Alaska 1976); *United States v. Bryant,* 439 F.2d 642, 651 (D.C.Cir.1971); *People v. Hitch,* 12 Cal.3d 641, 649–51, 527 P.2d 361, 367–69, 117 Cal.Rptr. 9, 14–16 (1974); *State v. Clements,* 52 Or.App. 309, 314, 628 P.2d 433, 435 (1981); *State v. Lovato,* 94 N.M. 780, 782, 617 P.2d 169, 171 (Ct.App.1980); *People v. Harmes,* 38 Colo. App. 378, 380–81, 560 P.2d 470, 472–73 (1976); *State v. Havas,* 95 Nev. 706, 601 P.2d 1197 (1979).

■ Further, as the Colorado Supreme Court stated, "[i]t is incumbent upon the state to employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties could reasonably foresee might be favorable to the accused. (citations omitted.)" *Garcia,* 197 Colo. at 46, 589 P.2d at 930.

█ Because the case does not require the establishment of such a broad duty, we do not declare one. But when, as here, the State chooses to use the fruits of physical evidence against the defendant, we find a corresponding obligation to acquire and preserve, within the bounds of reasonableness, the underlying physical evidence. As the *Garcia* court points out, "the trial of a criminal case is not a game of fox and hounds in which the state attempts to outwit and trap a quarry. (citation omitted.) It is, instead, a sober search for truth in which not only the resources of the defendant, but those readily available to the state must be put to work in aid of that search." *Garcia,* 197 Colo. at 47, 589 P.2d at 930.

█ The State's obligation in this case is not avoided because the officer apparently never held the blood sample in his hand. He requested the sample be taken and instructed the medical technologist regarding what procedures to follow. There was also evidence to indicate the sample was not used for medical purposes and was therefore for the officer's use only. We have no reason to doubt that the sample would not have been destroyed had the officer so requested. In these circumstances, the State had an obligation to preserve the evidence and could have done so by following established procedures, but did not.

The State cites *Clements* in support of its claim on this point. As noted above, the *Clements* court found an obligation to preserve evidence. *Clements,* 52 Or.App. at 314, 628 P.2d at 435. In *Clements,* however, the State was relieved of its disclosure duty because store security personnel had taken possession of the physical evidence before the police arrived on the scene. Here, the officer personally directed the acquisition of the physical evidence. We find the first *Brady* test satisfied.

█ II. The State contends the second *Brady* test is not met because the evidence of alcohol content above the statutory presumption of intoxication is inculpatory, not exculpatory. *Brady* itself is not on point with regard to this requirement in this case because in *Brady* the evidence in question

was still available; the parties could examine it and make a determination about whether it was helpful to the defense. Brown, confronted with the inculpatory test results, had no effective way to verify or challenge the accuracy of the test, to know whether the sample was potentially exculpatory as well. Where, as here, the evidence is irretrievable, courts have struggled with this "favorableness" requirement. We agree with those courts' findings that it would be unfair to require the defense to show favorableness when it is impossible to determine the nature of the evidence. A contrary holding could encourage "loss" to avoid a damaging disclosure. *State v. Booth,* 98 Wis.2d 20, 295 N.W.2d 194 (Wisc. Ct.App.1980); *People v. Dodsworth,* 60 Ill. App.3d 207, 17 Ill.Dec. 450, 376 N.E.2d 449 (1978).

In response to the inherent difficulties presented by this fact pattern, several courts have derived tests that are blends of "favorability" and "materiality," the third *Brady* test. The leading case is *United States v. Bryant:*

> What we do know is that the conversations recorded on the tape were absolutely crucial to the question of appellant's guilt or innocence. That fact, coupled with the unavoidable possibility that the tape might have been significantly "favorable" to the accused, is enough to bring these cases within the constitutional concern.... Were *Brady* and its progeny applicable only when the exact content of the nondisclosed materials were known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal.

439 F.2d at 648.

Similarly, *Booth,* under a decision of the Wisconsin Supreme Court, *State v. Amundson,* 69 Wis.2d 554, 577–78, 230 N.W.2d 775, 788 (1975), requires only that the *Bryant* standard be met. *Booth,* 98 Wis.2d at 25–26, 295 N.W.2d at 197. (The district court in the instant case specifically adopted the *Booth* reasoning.)

Colorado requires no "favorable" showing so long as the evidence is not merely "incidental" to the defendant's affirmative defense. *Garcia,* 197 Colo. at 46, 589 P.2d at 929; *People v. Morgan,* 199 Colo. 237, 241, 606 P.2d 1296, 1299 (1980). The test is met in Oregon if defendant establishes some "reasonable possibility" based on concrete evidence that the missing evidence would be favorable. *State v. Michener,* 25 Or. App. 523, 532, 550 P.2d 449, 454 (1976). The California Supreme Court draws an analogy to the duty to disclose to defendant the identity of an informer who may have helpful information, using the "reasonable possibility" standard. *Hitch,* 12 Cal.3d at 648–50, 527 P.2d at 366–67, 117 Cal.Rptr. at 14–15.

On the other hand, a favorableness showing has been required and deemed not to have been satisfied where the assertion was "speculative," *People v. Briggs,* 81 A.D.2d 1017, 1017–18, 440 N.Y.S.2d 143, 144–45 (1981), or where the evidence would bear only on the credibility of test results. *Turpin v. State,* 606 S.W.2d 907 (Tex.Cr.App. 1980).

■ We are in general agreement with the approach of the *Bryant* court. Where evidence is material and there is the "unavoidable possibility that the [evidence] might have been significantly favorable to the accused" denial of access to the evidence is a violation of due process. *Bryant,* 439 F.2d at 648. As our discussion of materiality below indicates, Brown easily meets the second *Brady* test.

*State v. Fitz,* 265 N.W.2d 896, 904 (Iowa 1978) does not contradict this conclusion. There, all evidence seized by the State was shared with the defendant, and his assertions that other evidence which might have been obtained from the crime scene would have been exculpatory or material were found to be purely speculative. The facts of *Fitz,* therefore, do not come under the *Bryant* rule and *Fitz* is inapposite here.

■ III. Evidence is material if it is offered to prove a proposition which is a matter in issue or is probative of the matter in issue. *McCormick's Handbook of the Law of Evidence* § 185, at 434 (2d ed. E. Cleary 1972). The issue here is whether Brown drove while under the influence of alcohol. A test for blood alcohol is obviously material. Our findings of materiality and of a due process violation are particularly appropriate here where the test results are the only direct evidence against the accused, *Booth,* 98 Wis.2d at 26–28, 295 N.W.2d at 196–98; *State v. Wright,* 87 Wash.2d 783, 794, 557 P.2d 1, 8 (1976) (Wright, J., concurring), and otherwise uncontradicted evidence questioning the test results had been offered.

■ Other courts have found physical evidence such as a breathalyzer ampoule or blood sample to be "obviously" material in an OMVUI case where, as in Iowa, the state has a presumptive law and the test has triggered the presumption. *Garcia,* 197 Colo. at 46, 589 P.2d at 929; *Lauderdale,* 548 P.2d at 380–81; *Hitch,* 12 Cal.3d at 647, 527 P.2d at 365–66, 117 Cal.Rptr. at 13–14; *Scales v. City Court of City of Mesa,* 122 Ariz. 231, 234, 594 P.2d 97, 100 (1979); *Lovato,* 94 N.M. at 782, 617 P.2d at 171. It should also be noted that evidence indicating a retest was possible provides support for materiality.

■ In a case very close on its facts to *Brown,* an Oregon court found materiality where breathalyzer ampoules had been destroyed, a video tape indicated no impairment, there was some likelihood the breathalyzer was incorrect, and a retest was possible. *Michener,* 25 Or.App. at 529–30, 550 P.2d at 452–53. *Accord, State v. Lance,* 48 Or.App. 141, 616 P.2d 546 (1980). *Lovato,* also particularly close on its facts and law, yielded the same result. We have examined the cases cited by the State where materiality was not found and find none persuasive. While the evidence in those cases was not probative, of speculative value only, or bearing solely upon credibility, the evidence in this case was critical. Further, the mystique which may attach to "objective" machines and quantitative evidence makes the need for procedural integ-

rity and access to test samples that much stronger.

We are also troubled in this case by the prospect that law enforcement could completely evade the requirements of chapter 321B by employing the method used by the officer in this case. The chapter 321B procedures were adopted to protect the integrity of the enforcement process and the interests of the State and defendant. While we find no evidence of manipulation in this instance, it would be imprudent to open the door to wholesale frustration of the legislature's intent.

AFFIRMED.